| | | |
|---|---|---|
| **RONALD McCLARY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **BELQUIS HOPKINS, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Plaintiff's Motion for Default Judgment, (Doc. No. 92), and Defendant Anthony Searles' Motion for Summary Judgment, (Doc. No. 95), and Defendants Belquis Hopkins and David Mitchell's Motion for Summary Judgment, (Doc. No. 104).

## I.      BACKGROUND

*Pro se* Plaintiff's Amended Complaint passed initial review on claims that he received deliberately indifferent medical treatment at the Lanesboro Correctional Institution against Nurse Supervisor Belquis Hopkins, Doctor Anthony Searles, and Superintendent David Mitchell. Presently pending are Plaintiff's Motion for Default Judgment, and Motions for Summary Judgment filed by Defendants Searles, Hopkins, and Mitchell.

**(1)      Amended Complaint** (Doc. No. 39)

Plaintiff alleges in his unverified Amended Complaint that Nurse Hopkins willfully and deliberately denied Plaintiff's sick call requests for three months at a time for his prostate and bladder problems. He also suffers pain from a deteriorated disc in his lower back. He repeatedly

wrote requests to Nurse Hopkins asking why he was not being seen. He suffered bad pain from January, 2015, to April, 2016. Nurse Hopkins and Dr. Searles knew about Plaintiff's ailments and pain because they are included in his medical records, and because of his multiple requests to medical and sick call. Plaintiff did not see Dr. Searles once in over a year to treat his many ailments and maladies. Dr. Searles' failure to treat Plaintiff resulted in pain and worsening of his conditions. Superintendent Mitchell was made aware of the denial and delay of treatment, which are in violation of sick call policy, and did nothing. Superintendent Mitchell and Nurse Hopkins have the authority to expedite but they did nothing even though they knew his conditions would worsen, which came to pass. Plaintiff seeks punitive and compensatory damages.

**(2)**     <u>**Plaintiff's Motion for Default Judgment**</u> (Doc. No. 92)

Plaintiff filed a "Motion for Default Judgment" dated October 29, 2018 that was docketed on November 1, 2018, alleging that the summons for Defendant Hopkins was served in August 2018 and she failed to file an Answer within 60 days.

**(3)**     <u>**Motions for Summary Judgment**</u>

     **(A)**     <u>**Defendant Searles**</u> (Doc. No. 95)

Dr. Anthony Searles argues that he was not deliberately indifferent to a serious medical need. Searles evaluated Plaintiff's medical chart on the single occasion when he reviewed it, prescribed appropriate treatment addressing the reason for the chart referral, exercised his medical judgment to address Plaintiff's subjective complaint of back pain, and did not knowingly violate any of Plaintiff's constitutional rights or knowingly deprive him of any necessary medical care. Dr. Searles also argues that he is entitled to qualified immunity because no constitutional right was violated and Dr. Searles' conduct was reasonable. To the extent that Plaintiff attempts to sue Dr. Searles in his official capacity, his claims for money damages are barred by sovereign immunity.

Plaintiff is not entitled to punitive damages against Dr. Searles in his individual capacity because Plaintiff has failed to set forth any factual allegations to support a finding that Dr. Searles acted with evil motive or intent

**(B)** **Defendants Hopkins and Mitchell** (Doc. No. 104)

Defendants Hopkins and Mitchell argue that Plaintiff cannot allege facts sufficient to prove that they were deliberately indifferent to Plaintiff's medical needs.

Defendant Mitchell argues that he, as correctional staff, had no involvement in Plaintiff's medical care, did not have any training on appropriate medical treatment for patients, had no ability to control or alter his plan of care, and had no control over the scheduling of patients' medical appointments. As Superintendent, Defendant Mitchell's responsibilities include administrative, but not clinical, supervision of health-related operations at the facility. Defendant Mitchell made sure sick call and emergency policies were followed and he was not made aware of any problems with the sick call process and believed that it operated correctly and that care was properly provided to all inmates including Plaintiff. Defendant Mitchell does not recall any complaints from Plaintiff directly to him, and no complaint that his care was delayed for three months.

Defendant Hopkins, who is a board-certified registered nurse, reviewed Plaintiff's medical records for the period in question. Those records do not reflect, and she has no memory of, seeing Plaintiff as a patient where she was the only or primary treating nurse. Defendant Hopkins denies that she did anything to delay or impede Plaintiff's ability to use the sick call process. Contrary to Plaintiff's apparent belief, Defendant Hopkins was not the Nurse Supervisor and had no control over the sick call process.

Further, Plaintiff cannot credibly forecast or prove that his condition worsened as a result of any delay in treatment.

3

Plaintiff's claims against Defendants Hopkins and Mitchell in their official capacities should be dismissed as barred by sovereign immunity.

Qualified immunity shields Defendants from Plaintiff's monetary damages claims in their individual capacities because they had no direct involvement in Plaintiff's medical treatment and did not violate any of Plaintiff's clearly established rights.

**(4)     Plaintiff's Responses**

Plaintiff was informed of the importance of responding to Defendants' Motions as well as the legal standard applicable to summary judgment motions. See (Doc. Nos. 99, 107).

**(A)     Defendant Searles** (Doc. No. 100)

In his unverified response in opposition to Defendant Searles' Motion for Summary Judgment, Plaintiff argues that Defendant Searles was deliberately indifferent to his serious medical needs and is not entitled to qualified immunity. Plaintiff appears to argue that the grievances he mailed with the Complaint demonstrate Defendant Searles' deliberate indifference. He claims that Defendant Searles was his primary care physician and that Searles has not come forward with any evidence to the contrary. Defendant Searles never saw him face-to-face before prescribing Mobic to which Plaintiff is allergic and that is not for use in elderly patients. Plaintiff claims that no discovery was given to him despite his requests. Defendant Searles has admitted the existence of a five-month backlog to be seen on sick call and that, by the time a doctor is seen, all the ailments had worsened. He claims that an x-ray taken at Maury C.I. will show "what Dr. Searles should have done" as Plaintiff requested on a sick-call. (Doc. No. 100 at 3). He claims that Dr. Searles did not ask about Plaintiff's back disk and severe pain and just prescribed a bad medicine. He further claims that Defendant has not sent all the sick calls with the exhibits and therefore the Court does not know if Plaintiff did file about other ailments. He argues that qualified immunity

should be denied because Defendant Searles willfully and knowingly violated Plaintiff's rights and knew he was breaking the law. In addition, he appears to claim that Defendant Searles is attempting to hide the Standard Operating Procedure and Medical Policy. Plaintiff claims that his list of health complains are chronic and did exist in 2015 at Lanesboro.

    **(B)**     <u>**Defendants Hopkins and Mitchell**</u> (Doc. No. 108)

In his unverified response in opposition to Defendants Hopkins and Mitchell's Motion for Summary Judgment Plaintiff argues that Hopkins is the Lead Nurse who is responsible for the day to day operations of the nurses and is misleading the Court. The fact that Hopkins does not do sick calls and answered grievances shows she is a lead nurse, and she lied about not having control over the sick call process. Defendant Mitchell's statement that he has never been the subject of a grievance by McClary is refuted by the November 19, 2015 grievance in which it was made known to Mitchell that Plaintiff was not receiving medical care. He cites to seven sick calls in which he was "not seen" as proof that Hopkins is lying about Plaintiff regularly receiving treatment: August 1, 2015, September 15, 2015, September 23, 2015, October 26, 2015, April 1, 2016, and April 22, 2016. (Doc. No. 108 at 3). He claims that, if he had refused to go to sick call, this would have been stated on the records. Plaintiff claims that Defendants try to prejudice him by sending write-ups of infractions and other complaints so that the Court will punish Plaintiff for his infractions and other actions, which are irrelevant. Plaintiff argues that his complaints have worsened and, even if they did not, he would not be precluded from obtaining relief. Grievances show that Defendants Hopkins and Mitchell were made aware that Plaintiff was not receiving treatment and that they ignored his grievances and letters. Plaintiff claims that the record proves he has the following conditions: high blood pressure for which he receives a special diet, enlarged prostate, bladder problems, deteriorated back disk, GERD, and h-pylori.

**(4)** **Defendants' Replies**

**(A)** **Searles** (Doc. No. 101)

Defendant Searles argues that, if Plaintiff had an allergy to any medication on January 24, 2015, Searles was unaware of it at the time he prescribed treatment for Plaintiff's complaint of back pain. The Provider Orders page on which Defendant Searles wrote his order for Mobic lists "NKA," or no known allergies. (Doc. No. 101 at 2). If Plaintiff had been prescribed Mobic in the past and had an adverse reaction, it was not noted in the chart where allergies should have been listed. Plaintiff offers no evidence that he was allergic to Mobic or that Defendant Searles knew of any such allergy at the time he prescribed it. Plaintiff cannot establish that Defendant Searles subjectively knew of Plaintiff's alleged allergy at the time and cannot satisfy the deliberate indifference standard.

Plaintiff alleges that no discovery was allowed in spite of his request, however, Plaintiff did not propound discovery to Defendant Searles during the discovery period and the time to do so has elapsed. Moreover, all of the pertinent medical records have been provided to Plaintiff via Defendant Searles' Motion for Summary Judgment.

Finally, Defendant Searles notes that he is not asserting as an affirmative defense that Plaintiff failed to exhaust administrative remedies. Therefore, there was no reason to provide Plaintiff with copies of his grievances or an affidavit from the Executive Director of the North Carolina Inmate Grievance Resolution Board.

**(B)** **Hopkins and Mitchell** (Doc. No. 111)

With regards to Plaintiff's claim that Defendant Hopkins is a Lead Nurse, Defendant Hopkins filed a supplemental declaration explaining that she was a Lead Nurse for a period of about five months, during part of which, she was assigned to Brown Creek C.I. rather than

Lanesboro C.I. where Plaintiff was housed. During that short period of time she did have some supervisory duties, but as Lead Nurse, rather than Nurse Supervisor, she did not have responsibility for the sick call procedures or overall responsibility for the nurses at Lanesboro. Further, no nurse other than a nurse practitioner can determine a course of treatment or prescribe medication. Defendant Hopkins denied that she has withheld or failed to provide any prescribed treatment.

Plaintiff's assertions that he was not seen on several dates when he sought sick calls are misleading or inaccurate. Defendants note that the sick call date is not necessarily the date upon which an inmate is seen for care, so the claim, for instance, that he was not "seen" on August 1, 2015, is misleading because he was seen on August 4, 2015. Therefore, the timeline that Plaintiff provided cannot be viewed as an indication of deliberate indifference by any person.

Defendants argue that the complaints that Plaintiff described are part of the routine discomfort of prison life and that his medical needs are not being deliberately ignored by anyone, much less Defendants Hopkins and Mitchell.

**(5)** <u>**Evidence**</u>[1]

    **(A)**     <u>**Affidavits of Anthony Searles, M.D.**</u> (Doc. Nos. 97, 101-1)

Defendant Searles is a medical doctor and licensed physician who worked during the relevant times as an independent contractor with NCDPS and its predecessor, NCDOC.

Plaintiff was housed at Lanesboro C.I. from January 1, 2015, through April 27, 2016, when he was transferred to Maury C.I. Defendant Searles reviewed Plaintiff's chart on one single occasion during the applicable time period in January 2015, which was the only occasion on which Plaintiff's chart was referred to him for review. During the applicable period, Plaintiff was never

---

[1] This section is not exhaustive.

referred to Searles for treatment in person.

In NCDPS, to obtain an appointment in a medical clinic without a regularly scheduled follow-up appointment, an inmate first submits a sick call request which is triaged by a nurse who refers an inmate to another healthcare professional, if necessary. The nurse is responsible for scheduling the inmate's appointments with a physician or physician extender. Defendant Searles does not supervise nurses in performance of their sick call appointment responsibilities.

Defendant Searles was asked by NCDPS to assist medical staff at Lanesboro in conducting chart reviews of inmates who had been referred to a camp provider by nursing staff. In January 2015, Searles began conducting chart reviews of inmate charts on the weekend at Lanesboro. He did not see the inmates in person as part of the chart review. If an inmate needed to be seen, he would be scheduled for an in-person appointment with a camp physician or physician assistant/ nurse practitioner when a camp provider was available. Searles did not see Plaintiff as a medical provider in the clinic during the applicable time period, nor was he referred to Searles for an in-person appointment at the clinic. Instead, Plaintiff was consistently seen by another Lanesboro physician, Dr. Gregory Haynes.

On January 24, 2015, Searles conducted a review of Plaintiff's sick call appointment notes in connection with a nurse's referral of his chart for a complaint of back pain from a January 13, 2015 sick call appointment. The portion of the chart that was sent for Searles' review was specifically tagged by the nurse. Back pain was the only issue for which Plaintiff's chart was referred to Searles. Based on Searles' review of the January 13, 2015 sick call appointment note regarding back pain, Searles entered an order for Plaintiff to take 7.5 mg of Mobic, a non-steroidal anti-inflammatory medication twice a day with food for 30 days to treat his complaints of back pain. Plaintiff did not complain of any bladder or prostate-related complaints during the January

13, 2015 sick call appointment, and the nurse did not note any such complaints, and no such complaints were referred to Searles for consideration, evaluation, or treatment.

Between January 24, 2015 when Searles completed his chart review and April 27, 2016 when Plaintiff was transferred to Maury C.I., neither Plaintiff nor his chart were referred for Searles' review, assessment, or treatment. Nor was Plaintiff ever scheduled for an in-person assessment or appointment with Searles in the medical clinic. Plaintiff was instead assessed and treated by Lanesboro nursing staff and Lanesboro Camp Physician Dr. Haynes on numerous occasions, Central Prison Urologist Dr. Gregory Janda on one occasion, N.P. Veronica Southerland on three occasions, and Dr. Clarence Ellis on one occasion.

Searles had no involvement with Plaintiff after he was transferred to Maury C.I. on April 27, 2016. At no time did Searles disregard symptoms contained in the single sick call appointment notes he reviewed pertaining to Plaintiff's back pain. Searles took appropriate action and made professional decisions and prescribed medication based on Plaintiff's complaint of back pain as documented by him and the sick call appointment nurse. None of Searles' actions or decisions was taken for the purpose of causing harm to Plaintiff.

Defendant Searles filed a Supplemental Affidavit explaining that the Provider Orders page on which Defendant Searles wrote his order for Mobic lists "NKA," or no known allergies, and explains that Geodon is an antipsychotic medication, and, that if Plaintiff is allergic to that medication Defendant Searles was unaware of that allergy and in any event he did not prescribe Geodon for Plaintiff. (Doc. No. 101 at 2).

**(B)**     **Plaintiff's Declaration** (Doc. No. 102-1)

Plaintiff states that he had a "bad side effect" from medication Geodon in 2010 and that it has been in his medical record since that time. (Doc. No. 102-1 at 1). The medication that

Defendant Searles prescribed in 2015, Mobic, notes in its list of side effects that it is not to be given to the elderly.[2] Defendant Searles never saw Plaintiff face-to-face or prescribed another medication after realizing that Plaintiff could not take Mobic for his painful back. Nor did Defendant Searles treat Plaintiff's other ailments that were raised in sick calls. Plaintiff did not see Defendant Searles in person for the entire time Plaintiff was at Lanesboro in 2015 and 2016. Plaintiff claims that policy requires a doctor is to see a inmate face to face and counsel when prescribing a new medication and that Defendant Searles failed to do this. Plaintiff suffered intense pain for months because he had no medication for his back.

(C)     **Declarations of Belquis Hopkins** (Doc. Nos. 106-1, 111-1)

In her Declaration, Defendant Hopkins states that she is a board-certified registered nurse and worked at Lanesboro C.I. at the relevant times. Hopkins' responsibilities as Nurse include: "administering medication, taking vital signs, performing initial examination of patients, referring patients to other healthcare providers, delivering care as directed by orders of physicians, physicians extenders, and nurse practitioners, and assisting in other capacities as needed." (Doc. No. 106-1 at 2). Hopkins is not, and has never been, a nurse supervisor. (Doc. No. 106-1 at 3).

Defendant Hopkins reviewed Plaintiff's medical records between December 12, 2014 and April 27, 2016, and concluded that Plaintiff regularly sought, and received, medical treatment using the sick call procedure at Lanesboro. (Doc. No. 106-1 at 4). Hopkins' review of the records confirms what she remembers – that she "did not see Offender McClary in a clinical setting" and "was never his primary, triage, or treating nurse." (Doc. No. 106-1 at 4). Hopkins did not do anything to impede Plaintiff's access to medical care or the ability to use the sick call procedure.

---

[2] Plaintiff states that he was 60 years old at the time Defendant Searles prescribed him Mobic. See (Doc. No. 102 at 2).

Hopkins denies having any supervisory role over the sick call process or the care, treatment, and referrals to other healthcare providers made or provided by other nurses. Despite having no supervisory role, Hopkins sees no evidence from her review of the medical records to support that Plaintiff was not provided the level of care staff deemed medically necessary to address his complaints. The record indicates that Plaintiff was referred to physicians and physician extenders on a regular basis. Hopkins does not believe from her review of the records that there is any indication that Plaintiff's medical needs were denied or even delayed.

The two conditions of which Plaintiff complains – urological problems and back pain – are "chronic or potentially chronic." (Doc. No. 106-1 at 4). Urological problems are chronic and "will not get better." (Id.). Back pain is "potentially chronic" and could become a condition that could be recurring or chronic. (Id.). However, even without any treatment, it could become better. The primary treatment for both of these conditions is symptom management. "With both of these conditions, delay in treatment does not make the underlying condition worse." (Doc. No. 106-1 at 5). From her review of the records, Hopkins does not see evidence of delay or that either of the conditions worsened appreciably over time.

Registered Nurses are not able to prescribe medication, conduct invasive examinations or treatments, conduct specialized urological examinations or treatment, or order or schedule treatment from a specialist such as a urologist. (Doc. No. 106-1 at 5).

Hopkins does not have any control over, or input with respect to, the decision-making process of the Utilization Review ("UR") Board, which has to approve doctor-recommended specialty appointments follow-up appointments with outside providers. Nor does Hopkins have any control over the timing of follow-up appointments and surgical procedures that have to be approved by UR.

After reviewing the medical records, Hopkins is unaware of any healthcare provider, including nurses, who were deliberately indifferent to Plaintiff's medical needs, or intentionally delayed or failed to distribute treatment or prescription medication. All of his complaints and grievances regarding medical care were investigated pursuant to NCDPS policy and procedures; his sick call requests and complaints were not ignored.

Hopkins denies that she was deliberately indifferent. She was never his treating nurse and did nothing to delay his treatment. To Hopkins' knowledge, Plaintiff was never deprived of medical care.

In her Supplemental Declaration, Defendant Hopkins states that she was only a "Lead Nurse" from approximately October 2015 through March 2016, and during part of that five-month period she was located at the Brown Creek C.I. rather than Lanesboro C.I. (Doc. No. 111-1 at 1). As Lead Nurse, Defendant Hopkins had some "limited supervisory duties, but … was not overall responsible for the nursing care or the sick call procedures at Lanesboro," which would have been the duty of a Nurse Supervisor. (Id.). Defendant Hopkins was never a Nurse Supervisor. (Id.). No nurse other than a nurse practitioner can determine a course of treatment or prescribe medication. Instead, "nurses must follow the treatment regimen created by the physician or physician extender." (Doc. No. 111-1 at 2). If a physician or physician extender did not prescribe medication, neither Defendant Hopkins nor any other nurse could dispense any medication to Plaintiff. Upon information and belief, the physicians or physician extenders did not prescribe the medication that Plaintiff is complaining of. At no time did Defendant Hopkins deny or fail to provide Plaintiff with any prescribed medication.

In reviewing Plaintiff's records, Defendant Hopkins relied in part on the statements contained in Defendant Searles' affidavit and the medical records attached to it.

Defendant Hopkins did nothing to prevent Plaintiff from using sick call procedures and it is clear from the medical records that he used the sick call procedure on numerous occasions. Defendant Hopkins did not see Plaintiff as a patient during his visits to nursing stations based on sick call requests.

      **(D)**       **<u>Declaration of David Mitchell</u>** (Doc. No. 106-5)

Defendant Mitchell is currently retired but was the Administrator at Lanesboro C.I. during the relevant time. Mitchell is not a healthcare provider and was never responsible for providing clinical care to inmates at Lanesboro. He was not responsible for clinical supervision of any healthcare providers at the facility. As superintendent, his responsibilities included "administrative, but not clinical, supervision of health-related operations at the facility." (Doc. No. 106-5 at 2). NCDPS Policy and Procedure provides that "clinical matters involving medical judgments are the sole province of licensed health care providers, not the Superintendent." (<u>Id.</u>). Lanesboro's SOP provides that all inmates can access routine health care through the sick call process. Emergency services are also processed through health care services. All inmates have the ability to declare a medical emergency and the inmate is assessed by medical immediately.

Correctional staff such as Mitchell do not have any training on the appropriate medical treatment for patients and would not have the ability to control or alter a plan of care concerning any patient's medical care. In addition, correctional staff is only allowed limited information regarding a patient's health pursuant to HIPAA.

During his time at Lanesboro, Mitchell did ensure that the sick call and emergency health care policy was in place and was followed. He was not made aware of any problems with the sick call process and he believed that it operated correctly and that health care was properly provided to all inmates including Plaintiff. Mitchell does not recall any complaints from Plaintiff directed

to him and he specifically does not recall a complaint that his care was delayed unnecessarily or deliberately.

In addition to the sick call appointment request process, Plaintiff also had access to the grievance process. Mitchell has never been the subject of and/or performed the initial investigation for any grievances filed by Plaintiff. Mitchell's involvement with any of Plaintiff's grievances would have been limited to reviewing his grievances at the administrator level, and he would have relied on the expertise and knowledge of the health care providers who would have previously investigated the claims in the grievance. (Doc. No. 106-5 at 3-4).

Mitchell "did not intentionally prevent Offender McClary from receiving medication or medical treatment. Nor was [he] deliberately indifferent to [Plaintiff's] medical needs." (Doc. No. 106-5 at 4). As Superintendent, Mitchell was unaware of any correctional staff intentionally preventing Plaintiff from receiving his medication, medical treatment, or being deliberately indifferent to his medical needs. As Superintendent, Mitchell was unaware of any healthcare provider who ignored or was deliberately indifferent to Plaintiff's medical needs. He is also unaware of any healthcare provider who intentionally delayed providing medical treatment to Plaintiff. Plaintiff was not at any time deprived of medical care.

**(D)** **Declaration of Stephen M. DeGaetano** (Doc. No. 106-6)

Stephen DeGaetano is Paralegal II with the North Carolina Department of Justice. A large part of his practice is devoted to assisting Assistant Attorneys General with the defense of prisoner litigation. Since 2014, Plaintiff has filed 42 lawsuits in North Carolina's Federal District Courts, and he has appealed in the Fourth Circuit Court of Appeals 20 times since 2005.

**(F)** **Time Line**

12/12/14    Plaintiff arrives at Lanesboro from Polk (Doc. No. 97-2 at 2)

14

Receiving Screening: currently being treated for "prostate, HTN" (Doc. No. 97-3 at 15)

Sick Call Appointment Request: "severe bladder problems cannot hold urine have an enlarged prostate. Pain during urination;" triaged 12/17/14; sick call appointment 1/5/15 (Doc. No. 97-4 at 2)

1/1/15 Sick Call Appointment Request: "having back pain severe. Preexisting, aggravated from the excessive force[];" triaged 1/7/15; "see sick call date 1-13-15" (Doc. No. 97-5 at 4)

1/7/15 Sick Call Appointment Request: "back pain pre-existing was aggravated on 12-12-14 when excessive force used…;" triaged 1/9/15; sick call appointment 1/13/15 (Doc. No. 97-5 at 2)

1/8/15 Sick Call Appointment Request: "having severe stomach pains. Mainly at night time…;" triaged 1/12/15; "see sick call 1-13-15" (Doc. No. 95-7 at 3)

1/24/15 Provider Orders: "nursing consult chart review," Mobic prescribed (Doc. No. 97-6 at 2)

1/29/15 Sick Call Appointment Request: cannot take Meloxicam the doctor prescribed because it causes heartburn and shortness of breath, "need different medication for my back problem;" triaged 2/3/15; "see visit of 2/4" (Doc. No. 97-7)

2/20/15 Consultation/Referral Form: "rush" urology cytoscopology at CP (Doc. No. 97-7 at 6)

2/21/15 Sick Call Appointment Request: thin mattress is causing worse, more severe back pain requesting brace or other relief; triage 2/25/15; addressed on 8/22/15 (Doc. No. 97-7 at 15)

3/17/15 Sick Call Appointment Request: enlarged prostate is painful during bowel movement; triage 3/19/15; addressed 8/22/15 (Doc. No. 97-7 at 17)

3/19/15 Refusal: first (Doc. No. 97-7 at 13)

4/18/15 Sick Call Appointment Request: bad back pain related to enlarged prostate; triage 4/21/15; sick call appointment 5/6/15 "-see sick call 4/22/15" (Doc. No. 97-7 at 20)

5/8/15 Refusal: sick call (Doc. No. 97-7 at 26)

5/25/15 Provider Progress Note (Doc. No. 97-7 at 21)

5/30/15        <u>Refusal</u>: sick call (Doc. No. 97-7 at 26)

<u>Sick Call Appointment Request</u>: renew special diet; triage 6/1/15; refusal 6/3/15 (Doc. No. 97-7 at 29)

5/31/15        <u>Refusal</u>: sick call (Doc. No. 97-7 at 26)

<u>Sick Call Appointment Request</u>: pain in anal area; triage 6/1/15; refusal 6/3/15 (Doc. No. 97-7 at 30)

<u>Sick Call Appointment Request</u>: acid reflux; triage 6/1/15; refusal 6/3/15 (Doc. No. 97-7 at 31)

6/16/15        <u>Sick Call Appointment Request</u>: back problems require 2 mattresses; triage 6/20/15 (Doc. No. 97-7 at 34)

7/12/15        <u>Sick Call Appointment Request</u>: toenail clipper, back problems; triage 7/13/15 (Doc. No. 97-7 at 38)

7/25/15        <u>Clinical Encounter</u>: provider Tamika Crump, R.N., re old back injury and thin mattress causing discomfort; "no current pain;" follow up with sick call as needed (Doc. No. 97-7 at 36)

8/1/15        <u>Clinical Encounter</u>: provider Tamika Crump, R.N.; provided nail clippers (Doc. No. 97-7 at 39)

<u>Sick Call Appointment Request</u>: pain in anal area; triage 8/4/15 (Doc. No. 97-7 at 42)

8/17/15        <u>Clinical Encounter</u>: provider Tamika Crump, R.N.; special meal eval, pain in anal area (Doc. No. 97-7 at 43)

8/28/15        <u>Sick Call Appointment Request</u>: blood in urine, pain; triage 8/29/15 (Doc. No. 97-7 at 57)

9/7/15        <u>Refusal</u>: second refusal (cystoscopy) (Doc. No. 97-7 at 13)

9/15/15        <u>Sick Call Appointment Request</u>: requesting specific medication for enlarged prostate, overactive bladder; triage 9/16/15 (Doc. No. 97-7 at 58)

<u>Sick Call Appointment Request</u>: pain in pelvic, groin area, burning with urination; triage 9/16/15 (Doc. No. 97-7 at 59)

9/23/15        <u>Sick Call Appointment Request</u>: pain in anal area; triage 9/26/15 (Doc. No. 97-7 at 60)

| | |
|---|---|
| 10/3/15 | <u>Consultation/Referral Form</u>: routine; complaint of blood in urine, appointment changed to 2/16; consultant findings dated 2/16/15 (Doc. No. 97-7 at 45) |
| 10/5/15 | <u>Clinical Encounter</u>: provider Gregory Haynes, M.D.; lower back pain (Doc. No. 97-7 at 46) |
| | <u>Provider's Orders</u>: Tylenol (Doc. No. 97-7 at 61) |
| 10/26/15 | <u>Sick Call Appointment Request</u>: pain with urination, blood; triaged 10/28/15 (Doc. No. 97-7 at 68) |
| 1/5/16 | <u>Clinical Encounter</u>: provider Veronica Southerland, N.P.; prescription renewal, frequent urination (Doc. No. 97-7 at 87) |
| 2/11/16 | <u>Sick Call Appointment Request</u>: need to see a urologist as bladder problem is worsening; triaged 2/13/16 (Doc. No. 97-7 at 114) |
| 2/22/16 | <u>Sick Call Appointment Request</u>: requesting baby powder because bladder problem is worsening; triaged 2/22/16 (Doc. No. 97-7 at 115) |
| 4/1/16 | <u>Sick Call Appointment Request</u>: back pain is getting worse, need x-rays and brace; triaged 4/3/16 (Doc. No. 97-7 at 118) |
| 4/5/16 | <u>Clinical Encounter</u>: provider Latasha Morrison, R.N.; re back pain and request for extra mattress (Doc. No. 97-7 at 121) |
| 4/22/16 | <u>Sick Call Appointment Request</u>: blood in urine, painful; triaged 4/22/16; marked "not seen" (Doc. No. 109 at 7). |
| 4/27/16 | <u>Plaintiff is transferred from Lanesboro to Maury</u> (Doc. No. 97-2 at 2) |

## II.    LEGAL STANDARDS

### (1)    <u>Default Judgment</u>

When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default. Fed. R. Civ. P. 55(a). A defendant's default does not automatically entitle the plaintiff to entry of a default judgment; rather, that decision is left to the discretion of the

court. Educ. Credit Mgmt. Corp. v. Optimum Welding, 285 F.R.D. 371, 373 (D. Md. 2012). The Fourth Circuit has a strong policy that cases be decided on their merits. United States v. Shaffer Equip, Co., 11 F.3d 450, 453 (4th Cir. 1993). Default judgment may be appropriate where a party is unresponsive. Lipenga v. Kambalame, 219 F. Supp. 3d 517, 524–25 (D. Md. 2016) (citing Optimum Welding, 285 F.R.D. at 373).

A six-factor analysis is used to determine whether good cause exists to set aside entry of default: (1) whether the defaulting party has a meritorious defense; (2) whether the defaulting party acts with reasonable promptness; (3) the personal responsibility of the defaulting party; (4) the prejudice to the non-defaulting party; (5) whether there is a history of dilatory action; and (6) the availability of less drastic sanctions. United States v. Moradi, 673 F.2d 725, 728 (4th Cir. 1982). Traditionally, relief from a judgment of default should be granted where the defaulting party acts with reasonable diligence in seeking to set aside the default and tenders a meritorious defense. Id. at 727.

**(2)     Summary Judgment**

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is material only if it might affect the outcome of the suit under governing law.  Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)

(internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. <u>Id.</u> at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Sylvia Dev. Corp. v. Calvert County, Md.</u>, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. <u>Anderson</u>, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009) (quoting <u>Matsushita v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986)).

As a general rule, when one party files a motion for summary judgment, the non-movant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion. <u>Celotex</u>, 477 U.S. at 324; <u>Kipps v. Ewell</u>, 538 F.2d 564, 566 (4th Cir. 1976); Fed. R. Civ. P. 56(e). However, a verified complaint, like the Amended Complaint that Plaintiff filed, is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge. <u>Williams v. Griffin</u>, 952 F.2d 820, 823 (4th Cir. 1991); <u>Davis v. Zahradnick</u>, 600 F.2d 458, 459–60 (4th Cir. 1979) (holding that the factual allegations contained in a verified complaint establish a prima facie case under 42 U.S.C. § 1983, so as to preclude summary judgment).

Plaintiff was informed in a detailed Order about the applicable legal standards, his

obligation to respond to Defendants' Motions for Summary Judgment, and his burden to support his assertions with admissible evidence or statements "under penalty of perjury." See (Doc. No. 107 at 3). Neither Plaintiff's Amended Complaint nor his summary judgment Responses is verified. Orsi v. Kirkwood, 999 F.2d 86, 92 (4th Cir. 1993) ("It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment."). Therefore, the Court construes Plaintiff's Amended Complaint and Responses as "mere pleading allegations." Walker v. Tyler County Com'n, 11 Fed. Appx. 270 (4th Cir. 2001); Fed. R. Civ. P. 56(c), (e).

**(2)      Deliberate Indifference**

"[T]he Eighth Amendment's prohibition against 'cruel and unusual punishments' [extends] to the treatment of prisoners by prison officials" and "forbids the unnecessary and wanton infliction of pain," Hill v. Crum, 727 F.3d 312, 317 (4th Cir. 2013) (internal quotations omitted). It appears that Plaintiff was an arrestee or pre-trial detainee at the relevant times, so his deliberate indifference claim is properly brought under the Fourteenth Amendment rather than the Eighth Amendment, but the analysis is the same under both. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983); see also Martin v. Gentile, 849 F.2d 863 (4th Cir. 1988) (applying the Fourteenth Amendment to an arrestee's deliberate indifference claim); but see Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473, 2475 (2015) (holding that the test for excessive force claims brought by pretrial detainees under the Fourteenth Amendment differs from the test for excessive force claims brought by convicted prisoners under the Eighth Amendment); see Lanier v. Henderson Cnty. Det. Ctr., 2016 WL 7007537 at *2, n. 3 (W.D.N.C. Nov. 29, 2016) (noting that the Supreme Court in Kingsley did not explicitly extend the objective reasonableness standard outside the excessive force context); see, e.g., Duff v. Potter, 665 Fed. Appx. 242, 244-45 (4th Cir. 2016) (applying the

<u>Kingsley</u> standard to a detainee's excessive force claim but not his medical need claim).

"Prisoners alleging that they have been subjected to unconstitutional conditions of confinement must satisfy the Supreme Court's two-pronged test set forth in <u>Farmer v. Brennan,</u> [511 U.S. 825, 832 (1994)]." <u>Scinto v. Stansberry</u>, 841 F.3d 219, 225 (4th Cir. 2016). The plaintiff must show that he had serious medical needs, which is an objective inquiry, and that the defendant acted with deliberate indifference to those needs, which is a subjective inquiry. <u>See</u> <u>Iko v. Shreve</u>, 535 F.3d 225, 241 (4th Cir. 2008). In order to be sufficiently serious, the deprivation must pose "a serious or significant physical or emotional injury resulting from the challenged conditions," or "a substantial risk of such serious harm resulting from ... exposure to the challenged conditions." <u>De'Lonta v. Angelone</u>, 330 F.3d 630, 634 (4th Cir. 2003) (internal quotation marks and citation omitted). To constitute deliberate indifferent to a serious medical need, "the treatment [a prisoner receives] must be so grossly incompetent, inadequate, or excessive to shock the conscience or to be intolerable to fundamental fairness." <u>Miltier v. Beorn</u>, 896 F.2d 848, 851 (4th Cir. 1990), *overruled on other grounds by* <u>Farmer</u>, 511 U.S. at 825. Where a deliberate indifference claim is predicated on a delay in medical care, there is no Eighth Amendment violation unless "the delay results in some substantial harm to the patient" such as "marked" exacerbation in his medical condition or "frequent complaints of severe pain." <u>Formica v. Aylor</u>, 739 Fed. Appx. 745, 755 (4th Cir. 2018) (noting that Fourth Circuit unpublished opinions are not binding precedent but noting that the substantial harm standard is consistent with at least four other courts of appeals) (quoting <u>Webb v. Hamidullah</u>, 281 Fed. Appx. 159, 166-67) (4th Cir. 2008), citing <u>Sharpe v. S.C. Dep't of Corr.</u>, 621 Fed. Appx. 732, 734 (4th Cir. 2015)).

Mere negligence or malpractice does not violate the Eighth Amendment. <u>Miltier</u>, 896 F.2d at 852. Further, "mere '[d]isagreements between an inmate and a physician over the inmate's

proper medical care' are not actionable absent exceptional circumstances." <u>Scinto</u>, 841 F.3d at 225 (quoting <u>Wright v. Collins</u>, 766 F.2d 841, 840 (4th Cir. 1985)).

**(3)**      **<u>Sovereign Immunity</u>**

       The Eleventh Amendment bars suits directly against a state or its agencies, unless the state has waived its immunity or Congress has exercised its power under § 5 of the Fourteenth Amendment to override that immunity. <u>Will v. Michigan Dep't of State Police</u>, 491 U.S. 58, 66 (1989). Congress has not imposed § 1983 liability upon states, and the state of North Carolina has done nothing to waive its immunity. <u>Bright v. McClure</u>, 865 F.2d 623, 626 (4th Cir. 1989) (citing <u>McConnell v. Adams</u>, 829 F.2d 1319, 1328 (4th Cir. 1987)).

       "[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. <u>See</u> <u>Almone v. City of Long Beach</u>, 478 F.3d 100, 106 (2d Cir. 2007); <u>see</u> <u>Hutto v. S.C. Retirement Sys.</u>, 773 F.3d 536, 549 (4th Cir. 2014) (State officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State).

**(4)**      **<u>Qualified Immunity</u>**

       The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." <u>Pearson v.</u>

Callahan, 555 U.S. 223, 231 (2009). The existence of qualified immunity "generally turns on the 'objective reasonableness' of the actions" without regard to the knowledge or subjective intent of the particular official. Am. Civil Libs. Union of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 784 (4th Cir. 1993) (quoting Anderson v. Creighton, 483 U.S. 635, 639, 641 (1987)) (internal citations omitted).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To find a right is clearly established does not mean that "the exact conduct at issue [must] have been held unlawful for the law governing an officer's actions to be clearly established."

Amaechi v. West, 237 F.3d 356, 362 (4th Cir. 2001). Rather, the court's analysis must take into consideration "not only already specifically adjudicated rights, but those manifestly included within more general applications of the core constitutional principle invoked." Id. at 362-63 (internal quotation omitted). The right at issue is "clearly established" for qualified immunity purposes if:

> [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. That is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.

Anderson, 483 U.S. at 640 (citation omitted).

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

## III. DISCUSSION

**(1)    Plaintiff's Motion for Default Judgment**

Plaintiff filed a "Motion for Default Judgment," alleging that Defendant Hopkins had failed to file a timely Answer. Plaintiff did not follow the two-step procedure set forth in Rule 55 and the Clerk of Court never entered a default. Defendant Hopkins appears able to establish good cause for her default and should be permitted to defend against this action because she has a meritorious defense, she filed an Answer within four days after Plaintiff's Motion was docketed, and there is no known history of dilatory action. See generally Moradi, 673 F.2d at 728; see, e.g., Harper v. Barbagallo, 2015 WL 4934749 (S.D. W.Va. July 17, 2015), *report adopted*, 2015 WL 4935358 (S.D. W.Va. Aug. 17, 2015) (applying the Moradi factors to determine that good cause existed for defendant's default and that he should be able to defend against the amended complaint). Further, even if Plaintiff had complied with Rule 55's two-step process and the Clerk had entered a default, the Court would set it aside. Id. For the foregoing reasons, Plaintiff's "Motion for Default Judgment" will be denied.

**(2)    Defendants' Motions for Summary Judgment**

**(A)    Deliberate Indifference**

**(i)    Defendant Searles**

Plaintiff alleges in his unverified Amended Complaint that Dr. Searles knew about his ailments and pain because they are included in Plaintiff's medical records, and because of his multiple requests to medical and sick call, that Plaintiff did not see Dr. Searles once in over a year to treat his many ailments and maladies, and that Dr. Searles' failure to treat Plaintiff resulted in pain and worsening of his conditions.

Defendant Searles filed a verified affidavit and medical records in support of his Motion for Summary Judgment demonstrating that ne never treated Plaintiff in person and only reviewed

his chart on a single occasion during the time in question. That chart review was referred to Defendant Searles by a nurse for the sole issue of back pain. After reviewing the portion of the chart that was sent to him for review, Defendant Searles entered an order for Mobic, a non-steroidal anti-inflammatory medication, to which there was no indication that Plaintiff was allergic. No other complaints were referred to Defendant Searles for consideration, evaluation, or treatment. At no time did Defendant Searles disregard symptoms during the single review he conducted pertaining to Plaintiff's back pain, he took appropriate action, and made professional decisions and prescribed medication based on Plaintiff's complaint of back pain as documented to him by the referring nurse. Defendant Searles states that none of his actions or decisions were taken for the purpose of causing Plaintiff harm.

In response to Defendant Searles' Motion, Plaintiff filed a verified declaration stating that he is allergic to Mobic, that his allergy to a different medication (Geodon) has been in his file since 2010, that Mobic is not supposed to be prescribed to elderly individuals, and that Defendant Searles violated prison policy by prescribing the Mobic without a face-to-face appointment with Plaintiff.

Defendant Searles filed a Supplemental Affidavit explaining that the Provider Orders page on which Defendant Searles wrote his order for Mobic lists "NKA," or no known allergies. (Doc. No. 97-6 at 2). Defendant Searles further explains that Geodon is an antipsychotic medication and, if Plaintiff is allergic to that medication, Defendant Searles was unaware of that allergy and in any event he did not prescribe Geodon for Plaintiff. (Doc. No. 101 at 2).

Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact that Defendant Searles knowingly provided inadequate care or exposed him to a risk of harm of which he was aware. See generally Farmer, 511 U.S. at at 837 (a person is only deliberately indifferent when he disregards a risk of harm of which he is aware); Rich v. Bruce, 129 F.3d 336, 338 (4th

Cir. 1997) (prison official was not deliberately indifferent even though he had actual knowledge of facts from which a reasonable person might have drawn an inference that defendant's actions exposed plaintiff to a substantial risk of serious harm because he did not actually draw the inference). At most, he has shown that Defendant Searles unknowingly prescribed a medication for the treatment of back pain for Plaintiff, who was 60 at the time, that is not recommended for elderly patients, and while under the belief that Plaintiff has no allergies whereas he had an allergic reaction to a completely different medication years earlier. Even if Defendant Searles was negligent for prescribing Plaintiff Mobic (which is not supported by the evidence), mere negligence or malpractice does not violate the Eighth Amendment and would not support Plaintiff's deliberate indifference claim. See Miltier, 896 F.2d at 85; Scinto, 841 F.3d at 225 ("mere '[d]isagreements between an inmate and a physician over the inmate's proper medical care' are not actionable absent exceptional circumstances.") (quotations omitted). Therefore, Defendant Searles' Motion for Summary Judgment will be granted.

### (ii)     **Defendant Hopkins**

Plaintiff alleges in his unverified Amended Complaint that Nurse Hopkins willfully and deliberately denied Plaintiff's sick call requests for three months at a time for his prostate and bladder problems. He claims that he repeatedly wrote requests to Nurse Hopkins asking why he was not being seen. Nurse Hopkins knew about Plaintiff's ailments and pain because they are included in his medical records and due to Plaintiff's multiple requests to medical and sick call. Nurse Hopkins has the authority to expedite but she did nothing even though she knew that Plaintiff's conditions would worsen, which came to pass.

Defendant Hopkins has filed two verified declarations in support of her Motion for Summary Judgment in which she states that she did not see Plaintiff in a clinical setting was never

27

his primary, triage, or treating nurse, and did nothing to impede Plaintiff's access to medical care or the sick call procedure. As a registered nurse, Defendant Hopkins is not able to prescribe medication, conduct invasive examinations or treatments, conduct specialized urological examinations or treatment, or order or schedule treatment from a specialist such as a urologist. Nor does she have control over the UR's decision-making process, or ability to approve or schedule follow-up appointments or surgical procedures that have to be approved by UR. Defendant Hopkins states that she was never deliberately indifferent to Plaintiff and denies knowing of any healthcare providers who deliberately delayed or denied him treatment.

In his Response to Defendant Hopkins' Motion for Summary Judgment, Plaintiff alleges that Hopkins was a Nurse Supervisor with supervisory authority within the medical department. Defendant Hopkins then filed a Supplemental Declaration explaining that she was a "Lead Nurse" for a few months of the relevant period and was never a Nurse Supervisor. She had no control over the sick call process, does not recall seeing Plaintiff as a patient where she was the only or primary treating nurse. Defendant Hopkins denies that she did anything to delay or impede Plaintiff's ability to use the sick call process.

Plaintiff has not come forward with any admissible evidence refuting Defendant Hopkins' Declarations and the medical records upon which she relies.

Plaintiff has failed to show that a genuine dispute of material fact exists with regards to Defendant Hopkins' alleged deliberate indifference. Defendant Hopkins' affidavit and the undisputed medical records demonstrate that Defendant Hopkins was never directly involved with Plaintiff's care, did not impede or delay his access to the sick call procedure, did not interfere with any care provided by any other healthcare providers, was not deliberately indifferent, and is unaware of any other healthcare provider deliberately delaying or denying him care. See generally

28

<u>Farmer</u>, 511 U.S. at at 837 (a person is only deliberately indifferent when he disregards a risk of harm of which he is aware); <u>Rich</u>, 129 F.3d at 338 (prison official was not deliberately indifferent even though he had actual knowledge of facts from which a reasonable person might have drawn an inference that defendant's actions exposed plaintiff to a substantial risk of serious harm because he did not actually draw the inference). Therefore, her Motion for Summary Judgment will be granted.

### (iii)    **Defendant Mitchell**

Plaintiff alleges in his unverified Amended Complaint that Superintendent Mitchell was made aware of the denial and delay of medical treatment, which violates sick call policy, and did nothing. He further claims that Superintendent Mitchell had the authority to expedite care but did nothing even though he knew Plaintiff's conditions would worsen, which came to pass.

Defendant Mitchell filed a verified Declaration in which he states that he was the Superintendent at Lanesboro during the relevant time. Defendant Mitchell was part of correctional staff, without any training or authority over clinical medical matters, and did not have the ability to control or alter a patient's care and had access to only limited information regarding patient health. Defendant Mitchell had administrative supervision over the health-related operations at the facility, and he ensured that the sick call and emergency health care policy was in place and was followed. He was not made aware of any problems with the sick call process and he believed that it operated correctly and that health care was properly provided to all inmates including Plaintiff. Mitchell does not recall any complaints from Plaintiff directed to him and he specifically does not recall a complaint that his care was delayed unnecessarily or deliberately. With regards to Plaintiff's grievances, Defendant Mitchell's involvement would have been limited to reviewing his grievances at the administrator level, and he would have relied on the expertise and knowledge

29

of the health care providers who would have previously investigated the claims in the grievance.

Defendant Mitchell states that he did not intentionally prevent Plaintiff from receiving medication or medical treatment, was not deliberately indifferent to Plaintiff's medical needs, was unaware of any correctional staff intentionally preventing Plaintiff from receiving his medication, medical treatment, or being deliberately indifferent to his medical needs, and was unaware of any healthcare provider who ignored or intentionally delayed providing medical treatment to Plaintiff.

Plaintiff has not come forward with any admissible evidence refuting Defendant Mitchell's Declaration.

Plaintiff has failed to demonstrate the existence of a genuine dispute of material fact with regards to Defendant Mitchell's alleged deliberate indifference either with regards to his personal actions or through his role as supervisor. It is undisputed that Defendant Mitchell was not personally involved in Plaintiff's medical care. See Formica, 739 Fed. Appx. at 755 (affirming summary judgment for jail superintendent because who was insufficiently involved in the conduct of which plaintiff complained); Banks v. Gore, 738 Fed. Appx. 766 (4th Cir. 2018) (where there is no direct evidence that the prison official actually knew of and disregarded a serious risk of harm, the risk must be so obvious that actual knowledge can be inferred from its mere existence). It is also undisputed that Defendant Mitchell was unaware of any deliberate indifference by medical staff and. See generally Greeno v. Daley, 414 F.3d 645, 655-56 (7th Cir. 2005) (a jail official's failure to take further action once he had referred the matter to medical providers cannot be viewed as deliberate indifference). Therefore, Defendant Mitchell's Motion for Summary Judgment will be granted.

**(2)**     **Sovereign Immunity**

To the extent that Plaintiff does attempt to seek damages against Defendants in their official

capacities, this is barred by sovereign immunity. See Almone, 478 F.3d at 106; Hutto, 773 F.3d at 549. Therefore, Defendants' Motions for Summary Judgment are granted on this basis.

**(3)**    **Qualified Immunity**

Defendants argue that qualified immunity shields them from damages in their individual capacities because Plaintiff has not made out a violation of a clearly established right and their actions were reasonable.

Defendants' sworn statements and the undisputed medical records show that Defendant Searles had a single contact with Plaintiff's treatment, at which time he provided appropriate care in accordance with his medical training and review of Plaintiff's records, and that Defendants Hopkins and Mitchell were never directly involved in Plaintiff's care. Plaintiff requested medical treatment on numerous occasions, his requests were triaged, and appropriate and reasonably timely care was provided.

Plaintiff has failed to demonstrate that any of the Defendants acted with deliberate indifference or violated any clearly established right. See Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 306 (4th Cir. 2004) (reversing denial of summary judgment for officer defendants under qualified immunity analysis where there was no evidence suggesting that the officers recognized that their actions were inappropriate under the circumstances); Deck v. Rubenstein, 2016 WL 2726543 at *5 (N.D. W. Va. April 13, 2016), *report adopted,* 2016 WL 2636300 (N.D. W. Va. May 6, 2016) (warden and department of corrections commissioner were entitled to qualified immunity on plaintiff's allegation that they "rubber stamped" his grievances and failed to intervene when he complained about his medical care because they had no involvement in direct day-to-day responsibility for health services and plaintiff failed to specify any direct acts taken by either defendant that violated his constitutional rights).

Therefore, Defendants are entitled to qualified immunity and their Motions for Summary Judgment are also granted on this basis.

## IV.     CONCLUSION

Based on the foregoing, Plaintiff's Motion for Default Judgment is denied, Defendants' Motions for Summary Judgment are granted, and this case will be closed.

**IT IS, THEREFORE, ORDERED** that:

1. Plaintiff's Motion for Default Judgment, (Doc. No. 92), is **DENIED.**

2. Defendant Searles' Motion for Summary Judgment, (Doc. No. 95), is **GRANTED**.

3. Defendants Hopkins and Mitchell's Motion for Summary Judgment, (Doc. No. 104), is **GRANTED**.

4. The Clerk of Court is instructed to close this case.

Signed: May 3, 2019

Frank D. Whitney
Chief United States District Judge